**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Empire Talent-Modeling Agency, LLC; Maria (Marisa) Sclafani, <br><br> Plaintiffs, <br><br> v. <br><br> Auto-Owners Insurance Company, <br><br> Defendant. | No. CV-12-00711-PHX-DGC <br><br> **ORDER** |

On February 15, 2013, Defendant Auto-Owners Insurance Company filed a motion for summary judgment. Doc. 57. Empire Talent-Modeling Agency, LLC, and Maria Sclafani (collectively "Plaintiffs") filed a joint response on April 1, 2013. Doc. 62. On April 26, 2013, Defendant filed a reply. For the reasons that follow the Court will grant Defendant's motion in part and deny it in part.[1]

**I.   Background.**

Plaintiff Empire Talent was insured by Defendant under Property Policy No. 47-905-554-00 from January 1, 2010 to January 1, 2011. On March 16, 2010, Plaintiff Sclafani's car was vandalized and two binders were stolen. Doc. 58 ¶¶ 3-4. Plaintiffs claim that the binders contained talent portfolios and written contracts of Plaintiffs' clients. *Id.* Plaintiffs notified Defendant of the incident and a claim was initiated. *Id.* ¶ 5. Because Plaintiffs believed the data was backed up on a hard drive, they did not

---

[1] Defendant's request for oral argument is denied because the parties have fully briefed the issues and oral argument will not aid the Court's decision. Fed. R. Civ. P. 78(b).

pursue the claim. *Id*. Thereafter, Defendant called Plaintiffs to inform them that Defendant needed documentation on the amount of the loss if it was to process the claim. *Id*. ¶ 7. Sclafani told Defendant that it cost approximately $800 to shoot the original photographs contained in the talent portfolios. Doc. 63 ¶ 8. Plaintiffs elected to not move forward with the claim at that time. Doc. 58 ¶ 12.

On September 1, 2010, Plaintiffs' laptop computer and external hard drive simultaneously failed. Doc. 63 ¶ 13. The computer and hard drive contained digital copies of talent profiles, client data, and contact information. Doc. 58 ¶ 15. Defendant states that a claim was initiated on November 1, 2010 (*id.* ¶ 16), while Plaintiffs believe the claim was initiated on the same day as the loss, September 1 (Doc. 63 ¶ 16).

Plaintiffs bring three claims arising from the manner in which Defendant handled the claim adjustment process. Plaintiffs allege breach of the covenant of good faith and fair dealing, breach of contract, and intentional infliction of emotional distress. Plaintiffs also seek punitive damages.

**II.  Legal Standard.**

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III. Analysis.

#### A. Standing.

Defendant asserts that Plaintiff Sclafani is not a named insured on the business personal property section of the policy. Defendant argues that she therefore lacks standing under Arizona law to bring a bad faith action related to the policy. Doc. 57 at 8 (citing *Stratton v. Inspiration Consol. Copper Company*, 683 P.2d 327 (Ariz. App. 1984)).

Plaintiffs argue that under an endorsement affixed to the policy, members and managers of a limited liability company can be considered an insured for purposes of duties related to the conduct of the business. Doc. 58-1 at 108. But as Defendant notes, the endorsement applies specifically to the "Businessowners Liability Coverage Form" and makes no mention of the "Businessowners Special Property Coverage" portion of the policy. *Id*; *see also* Doc. 58-1 at 5-25 (text of the Special Property Coverage). Plaintiff concedes that Defendant Empire is the named insured on the declarations page (Doc. 62 at 7), and provides no other evidence that Defendant Sclafani is a named insured for the purposes of the property coverage. The Court finds that she lacks standing to bring suit for breach of the property coverage portion of the policy or for breach of the covenant of good faith and fair dealing implied in that portion of the policy.

#### B. Covenant of Good Faith and Fair Dealing.

Under Arizona law, the covenant of good faith and fair dealing applies particularly to insurance contracts. *Rawlings v. Apodaca*, 726 P.2d 565, 569-70 (Ariz. 1986) ("implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured."). "The carrier has an obligation to immediately conduct an adequate investigation, act reasonably in evaluating the claim, and act promptly in paying a legitimate claim . . . It should not force an insured to go through needless adversarial hoops to achieve its rights under the policy." *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 280 (Ariz. 2000). Where the insurance company has a reasonable basis for denying or failing to process a claim, or where the claim is fairly debatable, a cause of

action for bad faith will not lie. *Lasma Corp. v. Monarch Ins. Co. of Ohio*, 764 P.2d 1118, 1122 (Ariz. 1988).

Plaintiffs argue that the claim for the failed computer and hard drive was filed in September 2010 and no "actual communication or substantive investigation" commenced until April 2011. Doc. 62 at 9. They claim that this resulted from "Defendant intentionally assigning adjusters who were not trained or capable of handling the type of claims being presented." *Id*.

Upon receipt of the claim, Defendant sent it to Mutual Boiler Re ("MBR"), one of Defendant's reinsurance companies, on November 3, 2010. Doc. 58 ¶ 17. While not privy to any communication between Plaintiffs and MBR, Defendant claims that it consistently kept in contact with MBR and that MBR was slow to process the claim because Plaintiffs consistently failed to provide necessary information. *Id* ¶ 18 (citing Doc. 58-2 at 41-47). After the first several months, Defendant took over primary responsibility for adjustment of the claim. Defendant then contracted with a forensic analysis firm that picked up the hard drive on March 28, 2011. Doc. 58 ¶¶ 29-30. The firm issued a report on April 19, 2011, concluding that the data on the hard drive could not be recovered. *Id*. The day after Defendant received the report on the hard drive, it sent Plaintiffs a letter asking for additional information about the profiles that the hard drive contained. Doc. 58-3 at 10-11. Defendant claims that Plaintiffs never responded to the communication and have yet to provide this information.

Plaintiffs also complain that they did not receive payment for the laptop computer until June 2011, and for the hard drive and blank CD's until March 2012. They argue that this delay was unreasonable. Defendant counters that it continued to work with Plaintiffs during the time from March 2011 through June 2011 to try to quantify the loss. Doc. 58 ¶¶ 24-26, 31-32, 34, 35, 37-38. Defendant claims that the only additional documentation it received from Plaintiffs was the sworn statement of loss which stated that the profiles consisted of 200-300 images of each client, that the actual value of the media loss was $249,800, but that the replacement costs for the same media was much

1  higher. Doc. 58-2 at 2. Attached to the sworn statement of loss were 350 client contacts
2  which Plaintiffs claimed documented the loss. *Id*. Defendant forwarded the statement of
3  loss and the contact information to the same forensic accounting firm that had analyzed
4  the hard drive for the purpose of valuing the claim. Doc. 58 ¶ 43. The firm had further
5  communications with Plaintiffs, eventually resulting in an email that listed the
6  information it required from Plaintiffs. Doc. 58-3 at 25-27. The email asked Plaintiffs to
7  confirm that they were "unwilling to disclose how much [they pay] the independent
8  photographer" and to confirm that Plaintiffs claim "it would cost at least $800 per person
9  to re-shoot and thus replace the lost images." *Id*. Plaintiffs did not respond to the
10 requests for additional information, but instead insisted that the "media loss claim be
11 settled without further interference[.]" Doc. 58-3 at 29. Plaintiffs refused to provide any
12 documentation of the potential cost to reshoot the lost photos or hire photographers for
13 that purpose. Plaintiffs failed to provide the names or addresses of any photographers
14 they used in the past or intended to use in the future, and provided no quotes from
15 photographers regarding the cost of replacement photographs. Doc. 58 at 10-11.[2]

16 Plaintiffs claim that the requests for additional information were in bad faith
17 because they had already informed Defendant that the requested information did not
18 exist. They also complained that one of the accountants assigned to the claim by the third
19 party forensic firm was a model for a competing agency and had a conflict of interest.
20 Doc. 63 ¶ 59. Finally, they claim that Defendant was not forthcoming about its coverage
21 position.

22 The parties dispute several details of the claim adjustment process, but the overall
23 timeline is largely undisputed. While there was some delay in the processing of the

---

[2] Plaintiffs claimed that each client portfolio cost $800 to produce. Ms. Sclafani testified in her deposition, however, that her clients would pay $800 to set up a photo shoot and develop a portfolio, but that she would negotiate with photographers and pay them less than $800. Doc. 58-2 at 12. Although some photographers demanded $800, she was often successful in paying less. *Id*. Plaintiffs' $800 replacement claim is obviously problematic because it often cost less to obtain the photographs. Moreover, Plaintiff Sclafani testified in her deposition that she had made no attempt to contact any of the clients whose portfolios were lost. *Id*. at 11.

claim, Defendants have produced call records, emails, and letters showing that the delay was primarily attributable to Plaintiffs' failure to provide necessary information, and that Plaintiff Sclafani was consistently apprised of the status of her claim. *See e.g.*, Doc. 58-2 at 15-20, 43-57, 59, 61, 63; Doc 58-3 at 2-3, 23, 31-32, 41-42.

The only other evidence Plaintiffs produce is the opinion of an insurance expert that the delay was improper. Doc. 63-9 at 54. But the same expert testified that if he were presented with a claim like Plaintiffs', he would seek much of the same information that Defendant requested to ascertain the cost of replacement. *Id*. at 32-37, 44-49.

Plaintiffs do not dispute that additional details about the cost of reproducing the portfolios were never provided, but argue that they could not produce information that no longer existed. Even if some of the requested information was not available, however, it is not reasonable to expect Defendant to promptly pay $249,800 without any information beyond a stack of heavily redacted client contacts and Plaintiff's word that each portfolio cost $800 to produce. Furthermore, Plaintiffs have pointed to no evidence that the forensic accountants assigned to this case had a conflict of interest, and, to the extent they did, Defendant reassigned the claim when Plaintiff complained about the potential conflict. Doc. 58 ¶¶ 59-60.

Defendant's attempts to acquire information necessary to process the claim were reasonable. Plaintiff did not provide that information, and the delay in paying the claim was the result. Although the question of reasonableness is often reserved for the jury, Arizona courts have held in insurance cases that "there are times when the issue of bad faith is not a question appropriate for determination by the jury." *Aetna Cas. & Sur. Co. v. Superior Court In & For Cnty. Of Maricopa*, 778 P.2d 1333, 1336 (Ct. App. 1989). This is such a case. Plaintiffs have failed to present evidence from which a reasonable jury could find that Defendant engaged in unreasonable delay. *Anderson*, 477 U.S. at 248. The Court will grant summary judgment on Plaintiffs' bad faith claim.

**C.    Breach of Contract.**

Plaintiffs claim that Defendant breached the insurance contract by not paying for

the loss of the client portfolios stored on the laptop computer and external hard drive. Defendant contends that Plaintiffs can obtain replacement value coverage for the portfolios only if they actually replace the portfolios, something they have not done. To evaluate this claim, a description of the insurance policy is required.

The policy is long – 130 pages – and difficult to understand. Doc. 58-1 at 1-130. Although the language is reasonably accessible, tracking through the many and scattered provisions and how they relate to each other is challenging, and took the Court several hours of tabbing, highlighting, re-reading, and discussing. The Court will address the relevant terms of the policy and the parties' arguments about those terms together.

The parties disagree on which policy definitions apply to Plaintiffs' laptop and hard drive, and what coverage limitations are imposed by the portfolios that were stored on them. Defendant claims that the storage unit within the laptop and the external hard drive constitute "media" within the meaning of the policy. Despite Plaintiff's assertion to the contrary, the Court finds that the internal and external hard drives clearly constitute "media" within the meaning of the policy: "[e]lectronic data processing, recording or storage media such as films, tapes, discs, drums or cells" (Doc. 58-1 at 16), and "materials on which information is recorded such as film, magnetic tape, paper tape, disks, drums, and cards" (Doc. 58-1 at 82). The words "such as" in these definitions suggest that the subsequently listed items are examples, not an exhaustive list, and a hard drive undoubtedly constitutes "[e]lectronic data processing, recording or storage media" and "material on which information is recorded." The lost portfolio data also constitutes "media" under the policy because "'[m]edia' includes computer software and reproduction of data contained on covered media." *Id.*

In identifying the limitations on payments for lost media, Defendant focuses on the Electronic Equipment endorsement found 72 pages into the policy. Doc. 58-1 at 72. Section 1(a)(2)(b) of this endorsement concerns "media," and states that "[w]e will pay for your costs to research, replace or restore information on 'media' which has incurred direct physical loss or damage by a Covered Cause of Loss." *Id.* The "Limit of

Insurance" section of the endorsement further provides that "[w]e shall pay no more for 'media' than the lesser of the following: (1) The actual cost to repair, replace or reproduce the 'media'; (2) If the 'media' is not repaired, replaced or reproduced, the value of blank 'media' of the same type; or (3) The Limit of Insurance shown in the Declarations for 'media'." *Id.* at 75. Because Plaintiffs have never replaced the lost portfolios, Defendant contends that it is obligated under these provisions to pay only for the value of blank media – for a replacement laptop and hard drive – not for the cost of recreating the portfolios. The Court agrees that the language of the policy, once carefully studied, appears to require such a result.

In addition to Plaintiffs' argument that the laptop, hard drive, and portfolios do not constitute "media" – an argument which the Court finds wholly unconvincing – Plaintiffs claim that there is an alternative way for them to recover the value of the lost portfolios. They point to the original "Loss Payment" provision on page 16 of the policy and note that it permits an insured to recover *either* replacement value or the "actual cash value" of the lost property. Doc. 58-1 at 16. They note that an actual cash value recovery does not require that the insured replace the lost property as does the replacement value method of recovery. *See id.* at 17. As a result, they claim that they can obtain the actual cash value of the lost portfolios without having to actually replace them.[3]

Although this reading of the words in the "Loss Payment" section of the policy appears to be correct, that section does not apply to Plaintiffs' claim because it is

---

[3] Defendant argues that Plaintiffs cannot claim actual cash value because their own expert testified in deposition that valuation of media cannot be anything other than replacement cost. *See* Doc. 63-9 at 29-30. In context, the expert appears to have testified that there would be no difference between the actual cash value of media and the replacement cost of media because media (such as the portfolios stored on the hard drive) do not depreciate. *See id.* at 30 ("Actual cash value is cost to replace it less any deduction for depreciation, that's the definition of actual cash value."). Even if this is true, the policy contains different provisions for actual cash value and replacement value, only one of which requires that the insured actually replace the lost property. If Plaintiffs had the option to proceed under the actual cash value provision, the policy would not require them to replace the lost portfolios. This is true even if the final valuation number would be the same as replacement value. The provisions of the policy, not the final valuation numbers they produce, govern whether or not Plaintiffs are required to replace the lost media.

1  superseded by the Electronic Equipment endorsement. In bold and at the top, the
2  endorsement states: "THIS ENDORSEMENT CHANGES THE POLICY, PLEASE
3  READ IT CAREFULLY." *Id.* at 72 (emphasis in original). The endorsement then states
4  that it "modifies" the "BUSINESS SPECIAL PROPERTY COVERAGE FORM," which
5  is where the "Loss Payment" provision relied on by Plaintiffs is found. The endorsement
6  provides, as noted above, that lost "media" will be covered only to the extent it is actually
7  replaced by the insured, or to the extent of blank media replacement value. *Id.* at 72, 74.
8  Thus, Defendant appears to be correct in asserting that Plaintiffs can recover the
9  replacement value of the portfolios only if they have actually replaced them. Otherwise,
10 Plaintiffs are limited to the value of blank computer media.

11 Although the Court would be inclined for these reasons to grant summary
12 judgment to Defendant on the breach of contract claim, Plaintiffs also invoke Arizona's
13 reasonable expectations doctrine. That doctrine holds that "Arizona courts will not
14 enforce even unambiguous boilerplate terms in standardized insurance contracts in a
15 *limited* variety of situations." *Gordinier v. Aetna Cas. & Sur. Co.*, 742 P.2d 277, 283
16 (Ariz. 1987) (emphasis in original). Boilerplate terms are not enforced when a
17 reasonably intelligent consumer is unable to understand them, when the insured did not
18 receive full and adequate notice of an apparent emasculation of coverage, or where some
19 activity reasonably attributable to the insurer creates an objective impression of coverage.
20 *Id*. Given the length and complexity of this policy, the Court has serious doubts about
21 whether a reasonably intelligent consumer could understand the precise limits on
22 insurance for lost data. More importantly, however, Plaintiffs have presented evidence
23 that Defendant's sales agent told Ms. Sclafani that loss of her portfolios would be
24 covered regardless of whether she actually replaced the portfolios. *See* Doc. 63-1 at 38;
25 Doc. 63-2 at 7. Defendant does not dispute that the individual who allegedly made these
26 statements was its agent. Doc. 67, ¶ 82. It argues instead that any testimony by Ms.
27 Sclafani about what the agent said would be inadmissible hearsay. *Id.* This is incorrect
28 for two reasons. First, statements by Defendant's agent made in the course of his

employment would not constitute hearsay. Fed. R. Evid. 801(d)(2)(D). Second, the statements likely would be admitted not for the truth of the matter asserted, but for their effect on Ms. Sclafani in inducing a reasonable expectation that the portfolios would be covered even if not actually replaced.

The Court concludes that Plaintiffs' evidence creates a material question of fact as to whether coverage is available for the lost portfolios under the reasonable expectations doctrine. The Court therefore will deny summary judgment on Plaintiff Empire's claim for breach of contract.

### D.     Intentional Infliction of Emotional Distress.

To prevail on a claim for intentional infliction of emotional distress under Arizona law a Plaintiff must show:

> [F]irst, the conduct by the defendant must be "extreme" and "outrageous"; second, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and third, severe emotional distress must indeed occur as a result of defendant's conduct.

*Citizen Publ'g Co. v. Miller*, 115 P.3d 107, 110 (Ariz. 2005) (citing *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987)).

The Court has already found that there is insufficient evidence from which a reasonable jury could conclude that Defendant's handling of the claim was unreasonable. Plaintiffs similarly fall short of providing sufficient evidence to reasonably conclude that Defendant's conduct was "extreme" or "outrageous." Accordingly, the Court will grant Defendant's motion for summary judgment on the intentional infliction of emotional distress claim.

### E.     Punitive Damages.

Because Plaintiffs' tort claims have not survived summary judgment, the request for punitive damages must also be denied.

**IT IS ORDERED**

1. Defendant's motion for summary judgment (Doc. 57) is **granted** with

- 10 -

1  respect to all claims by Plaintiff Sclafani and with respect to Plaintiff Empire's claims for
2  breach of the covenant of good faith and fair dealing and punitive damages. The motion
3  is **denied** with respect to Empire's claim for breach of contract.

4      2.     The Court will set a final pretrial conference by separate order.

5  Dated this 24th day of May, 2013.

*David G. Campbell*
United States District Judge